ROSS v. KNOTT, State Treasurer, et al.

No. 21.

District Court, N. D. Florida. Tallahassee Division.

Feb. 20, 1936.

J. Turner Butler, of Jacksonville, Fla., for plaintiff.

T. J. Swanson, of Perry, Fla., Cary D. Landis, Atty. Gen., and H. E. Carter and James B. Watson, Asst. Attys. Gen., State of Florida, for defendants.

LONG, District Judge.

This cause is before the court on motion of the defendants Knott, as treasurer of the state of Florida, as ex officio treasurer of Taylor county, Fla., Dave Sholtz, as Governor, and J. M. Lee, as comptroller; and upon motion of Taylor county, Fla., a political subdivision of the state of Florida, to dismiss the bill of complaint filed herein.

It appears from the bill of complaint that in the latter part of the year 1929 and in the early part of the year 1930, the First National Bank of Perry pledged with the bond trustees of Taylor county, Fla., certain securities which aggregated the face value of some $69,500, and that thereafter the said bond trustees assigned the agreement and pledged securities to the defendant Knott, who was at the time state treasurer, and as such ex officio treasurer of Taylor county, Fla. It further appears that the bank, through its officers, pledged bonds on March 12, 1930, in the sum of $10,000 to secure funds deposited by the said Knott, state treasurer, as county treasurer ex officio; and that, on March 15, 1930, the bank pledged $10,000 of town of Perry bonds with Knott in said capacity to secure funds deposited with said bank.

In the latter part of October, 1930, the bank failed; and the plaintiff, Ross, was appointed receiver and as such receiver paid to the defendant Knott, state treasurer, as county treasurer ex officio, some

$20,000 derived by him in the collection of securities which had been pledged with the bond trustees and left with the bank. Some time afterwards the said defendant, Knott, derived some $3,000 from the balance of pledged collateral which was in his hands.

It is contended that these pledge agreements were ultra vires and void when made, because prior to June 25, 1930, national banks had no power to pledge their assets to secure deposits of public funds of states, or their political subdivisions; because, at the time of the execution of said agreements, they were illegal and contrary to the public policy of the United States; and because they operate to prefer the defendants over common depositors.

As to the securities paid over and delivered by the receiver himself, it is contended that such payment and delivery was made under misapprehension as to the applicable law; and that they should be recovered because such payment was illegal, preferential, and a fraud upon creditors.

The motions to dismiss set up a number of grounds which squarely present the question of the validity of the pledges as to unpaid balances remaining on deposit after June 25, 1930, upon the determination of which question the bill must stand or fall.

On the 25th day of June, 1930, the act of Congress amending the provisions of the National Banking Act became effective (12 U.S.C.A. § 90); and this amendment permitted national banks to give security for the safekeeping and prompt payment of such money as is here involved of the same kind as is authorized by the law of the state in which the bank is located. Prior to the passage of this act, national banks were without authority to pledge their assets as security for the safekeeping and prompt payment of public moneys of states, and their political subdivisions, deposited with them.

At the time of the deposit on the part of the treasurer and of the execution of the agreements by which the bank pledged the security, the Florida Law permitted banks to pledge their assets as security for the safekeeping and prompt payment of such deposits of public funds. At such time the national bank was without authority; but after the amendment of June 25, 1930, national banks were authorized to make such pledges as security for such deposits; and, when the amendment became effective,

there was in the hands of the bank a balance due to the defendant Knott, as state treasurer and ex officio county treasurer, which balance was secured by collateral placed in his hands prior to the amendment of the National Banking Act. The First National Bank of Perry continued to do business until the latter part of October, 1930, several months subsequent to the amendment of June 25, 1930. During this period, the bank made no effort to withdraw its pledged security; but, in order to retain the unpaid balance of the deposit made prior to the amendment, permitted its security to remain pledged to secure such balance due, at a time when the state law required, and the National Banking Act permitted, such security to be given.

While the facts are not the same, the case of Lewis, Receiver, v. Fidelity & Deposit Co. of Maryland, 292 U.S. 559, 54 S. Ct. 848, 853, 78 L.Ed. 1425, 92 A.L.R. 794, decided June 4, 1934, presented a question which is quite similar to that in the case at bar. In that case a national bank had qualified as a public depositary under the laws of the state of Georgia, which required bond in double the amount of the deposits. The Fidelity Company was surety on the bond involved, which was executed in 1928. The Georgia law then provided that, upon the giving of such bond, there should arise and be created a general lien upon all of the assets of the bank, both those presently held and those thereafter to be acquired. Deposits were made; and at the time of the passage of the amendment of June 25, 1930, there was a balance on hand due the depositor, which balance was withdrawn soon thereafter. Later, between June 25, 1930, and the appointment of the receiver in 1932, deposits were regularly made and aggregated a large sum. The unpaid balance on hand at the time of the appointment of the receiver the Fidelity Company paid, taking an assignment of the rights of the depositor against the bank. No bond, other than the original 1928 bond, was ever given. The Supreme Court of the United States held that when the bond was originally given it was ineffective to create a lien; but that when the legal obstacle to the lien was removed by the amendment of June 25, 1930, the original agreement could as to the future be given the effect intended by the parties, and the lien became operative as to the deposits thereafter made. Consequently, the Fidelity Company was held entitled to

assert the lien as against the general assets of the bank in the hands of the receiver.

In the case at bar, the Florida Laws permitted the pledging of securities by banks and a continuing agreement was entered into by the treasurer with the First National Bank of Perry, which agreement was that the treasurer would deposit money, and would recognize that bank as a public depository. These securities were pledged for the safekeeping and prompt payment by the bank of these deposits. Thus far, the only distinction between the Lewis Case and the instant case is that there a general lien was provided upon the giving of bond, while in the case at bar a specific lien was contemplated upon the securities pledged with the state treasurer. After the adoption of the amendment of June 25, 1930, it is true that no deposits were made by the state treasurer in the instant case, but there was a balance on deposit which remained due and unpaid until the bank closed its doors in the latter part of October, 1930. It is true, according to the allegations of the bill, that the state treasurer made no further deposits and that he did not call on the bank to repledge its securities, but that he contented himself with the security pledged prior to the amendment; but it is likewise true that the legislatively established public policy of the state of Florida required security to be taken for such deposits, and after June 25, 1930, national banks were authorized to give it. Moreover, on June 25, 1930, and thereafter, such security was held under the pledge agreements set up in the bill.

Deposits in a bank create but one liability, that of debtor and creditor; and to say that the pledging of the security before the amendment was null and void and inoperative to protect a balance in the hands of the bank after the obstacle, which prevented an effective original pledge, was removed and the original agreement could be given the effect intended, would in the instant case be to allow the bank to continue to hold unpaid balances, having theretofore delivered security, at a time when the state law in effect required, and the federal law authorized, security to be given. To say that the original agreement of the parties may be given the effect intended as to deposits made after June 25, 1930, but not as to unpaid balances remaining on deposit after that date is to sacrifice equitable principles upon the altar of tenuous distinctions. In each situation the relation of the bank and the depositor is the same, that of debtor and creditor. It is hardly to be presumed that, in order to make the unpaid balance a deposit for which the security would be liable, it would be necessary for the treasurer to have appeared at the bank window, give his check for the unpaid balance; and, the next moment, deposit it. In the Lewis Case, the Supreme Court said: "It appears that the balance on hand June 25, 1930, was withdrawn soon thereafter; that between June 25, 1930, and the appointment of the receiver, May 23, 1932, deposits were regularly made aggregating a large sum; that from time to time checks were drawn against these deposits; and that all of the balance in bank when the receiver was appointed represented deposits made after the passage of the act. The appointment of the bank as depository in 1928 and the bond were to cover a period of four years. Though the lien was in form security for the bond, the extent of liability was to be measured by the unpaid balance. Thus, the transaction was not completed in 1928; it was contemplated that there would be continuous dealings between the parties for four years. In fact, the relation continued until the appointment of the receiver. Throughout the whole period the parties intended that the lien should be operative and supposed that it was. The appointment was within the power of the state to confer and of the bank to accept, but, by reason of the paramount federal law, one of the anticipated incidents of the relation, the lien, could not arise. When that obstacle was removed by the Act of June 25, 1930, the original agreement could as to the future be given the effect intended by the parties; and the lien became operative as to deposits thereafter made and is entitled to priority from the date of the act. A statute is not retroactive merely because it draws upon antecedent facts for its operation."

For reasons above stated, these motions to dismiss will be granted, and the bill of complaint dismissed.