## SETTEGAST et al. v. TIMMINS et al.
### (No. 1655.)

Court of Civil Appeals of Texas. Beaumont.
May 2, 1928.

Rehearing Denied May 16, 1928.

1. **Brokers ⬤⇒53—Broker to recover commissions must show services were procuring cause of lease.**

Broker can recover commissions for procuring lease of realty only by showing that services rendered by him were procuring cause of lease.

2. **Brokers ⬤⇒56(1)—Owner making sale to broker's customers pending broker's negotiations must pay commissions.**

Owner making sale to broker's customers pending broker's negotiations must pay commissions to broker as per agreement.

3. **Brokers ⬤⇒86(4)—Finding that brokers were procuring cause of lease to corporation organized by customers procured by brokers in compliance with agreement between brokers and owners held supported by evidence.**

Evidence that owners of realty made lease to corporation after negotiating directly with customers whom they knew were procured by brokers, and that corporation came into existence only by aid of brokers' customers in compliance with contract between brokers and owners, supported finding that brokers were procuring cause of lease to corporation, though lease was made on option given another pending negotiations who was instrumental in inducing brokers' customers to join in lease.

4. **Brokers ⬤⇒88(10)—Charge defining "procuring cause" as cause producing event without independent intervening cause held proper.**

In suit by brokers to recover commissions for procuring lease of property, charge defining "procuring cause" as cause which is natural and continual sequence unbroken by any new independent intervening cause, which produces event and without which it would not have occurred, *held* proper.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Procuring Cause.]

5. **Brokers ⬤⇒8(3), 86(1)—Evidence of employment and services held sufficient to sustain quantum meruit finding for brokers.**

In suit by brokers to recover commissions for procuring lease of realty, evidence of employment of brokers to secure tenant and services rendered by brokers in procuring customers was sufficient to sustain quantum meruit finding.

6. **Husband and wife ⬤⇒268(1)—Husband not acting solely for wife in leasing wife's separate property held liable for commissions, where he was necessary party lessor, and proceeds of lease constituted community property.**

In suit by brokers to recover commissions for procuring lease of realty brought against husband and wife, where evidence raised issue that husband was not acting solely for wife in making lease of wife's separate property, and husband was necessary party lessor, and proceeds of lease constituted community property, husband was liable for commissions.

7. **Brokers ⬤⇒74—Joint judgment for commissions against defendants jointly employing broker and owning property equally held proper.**

Where defendants jointly entered into contract to lease property, making express contract of employment, and interest of one defendant and other defendant and wife were equal, joint judgment against defendants for commissions was proper.

8. **Interest ⬤⇒19(3)—Assessment of interest as matter of law on judgment on unliquidated claim in quantum meruit for broker services held proper.**

Where broker, suing for commissions, specially pleaded for interest at 6 per cent. from date of execution of lease contract procured, assessment of interest, as matter of law, on judgment fixing quantum meruit compensation for broker, was proper.

9. **Interest ⬤⇒61—To sustain judgment for interest on damages, cause of action must be a proper one, interest must be pleaded, amount of damages liquidated by jury, then court should assess interest as matter of law.**

To sustain judgment for interest on damages, plaintiff's cause of action must constitute claim to which interest may be added, issue of interest as element of damage must be pleaded, damages when unliquidated must be fixed by jury, issues must be submitted to jury in terms not involving interest, so that jury's find-

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ing of specific sum does not include interest, and trial court must, as matter of law, add interest to verdict from date of accrual of cause of action to date of judgment, which can be defeated only by defendant pleading facts sufficient in law to defeat claim for interest.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Suit by I. C. Timmins and another against J. J. Settegast, Jr., and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

J. W. Lockett, King & Wood, and Campbell, Myer & Simmons, all of Houston, for appellants.

Stewart, De Lange & Milheiser and W. P. Hamblen, all of Houston, for appellees.

WALKER, J. This was a suit by appellees I. C. Timmins and E. A. Dunnam against appellants A. J. Binz and J. J. Settegast, Jr., and Mrs. Melanie Settegast, wife of appellant Settegast, for commissions for making a lease to the Main Realty Company, a corporation, of certain property situated at the corner of Main street and McKinney avenue, Houston, Tex., belonging to appellant Binz and Mrs. Settegast. A verdict was peremptorily instructed in favor of Mrs. Settegast. On the answer of the jury to special issues, judgment was rendered for appellees against appellants for $10,000, the value of their services in perfecting the lease.

The suit was filed August 18, 1925. The evidence is sufficient to support the following conclusions:

In 1924, appellant Binz and Mrs. Settegast owned the property in question, which at that time was of high value, and being unimproved was expensive to hold because of the yearly taxes. About October, 1924, acting for himself and appellant Binz, appellant Settegast employed appellee Timmins to secure a tenant for this property on a long term lease, agreeing to pay a commission for this service. Timmins, with the knowledge and consent of appellants, associated himself with appellee Dunnam in his contract. Together appellees offered this property to Santikos and Morosis, wealthy theater people of San Antonio, who were able to handle appellants' property. However, they informed appellees that, if they handled this property, it would have to be through a corporation organized for that purpose, as they did not want to take it in their names personally nor in the name of their San Antonio company. Appellants were advised of and consented to this proposition. Appellees gave appellants notice of the names of their customers, their residence, their business, and that they were desirous of leasing the property for theater purposes. Appellees were diligent in their negotiations between appellants and Santikos and Morosis from the inception of the contract until appellants finally made a lease to the Main Realty Company, a corporation organized for the purpose

of taking over the lease. In February, 1925, during the negotiations between appellees, appellants, and Santikos and Morosis, appellants gave to William Epstein of San Antonio a written option to lease this property, which was without consideration. After holding this option for two weeks or more, Epstein carried his proposition to Santikos and Morosis and they agreed with him to organize a corporation to handle the lease on the terms of the option and to accept appellants' terms as stated in the option. Before the option expired Epstein notified appellants that he would take the property on the terms submitted, and on the 24th of March, 1925, joined with appellants in the execution of a written lease on the property, which on the part of appellants was executed by A. J. Binz. Mrs. Melanie B. Settegast, and J. J. Settegast, Jr., and on the part of Epstein by "William Epstein, Trustee." The cash consideration for this lease was $12,500, and with increasing payments during the term of 99 years.

Some days later the corporation, Main Realty Company, was organized, and a lease in due form executed between it and appellants, joined by Mrs. Settegast, for the period of 99 years, giving an option to buy, etc. It was understood that Santikos and Morosis were to subscribe for 50 per cent. of the stock of this company. The stock list showed that each of them took and paid for $3,200 of the stock and the lawyer organizing the company took $100. The balance was subscribed by Epstein and his other associates. Immediately after appellants gave the option to Epstein, appellees heard of it and went to see appellants about it. Appellants admitted the execution of the lease, but, as it was without consideration, told appellees it was not binding and that they would continue their negotiations with their customers. Appellees afterwards heard that Epstein was negotiating with Santikos and Morosis and so advised appellants, and also advised them that Santikos and Morosis were still their customers and that, if the lease was made to Santikos and Morosis, appellees would expect their commission. During the pendency of the negotiations between Epstein and appellants and before the lease was finally closed, appellees continued their negotiations direct with Santikos and Morosis, who pretended to be willing to lease direct from them and the owners.

Appellees urged Santikos and Morosis to come to Houston for a further conference. On the 18th of March, appellees talked by telephone with Santikos at San Antonio and told him to advise Morosis to come to Houston and that they would meet him at the train. Santikos promised that Morosis would come to Houston and have Epstein with him and that Morosis would be on the lookout for appellees. Appellees met the train on the morning of the 19th, but did not see Morosis and Epstein. On receiving information that Morosis was coming to Houston on the 19th, appellees made

an appointment with appellants. They went to appellants' office on that day and were informed by them that Epstein "and a big, fat dark-complected man" were in their office about 8 o'clock. It was later determined that this man was Morosis. In that conversation appellees "advised appellants about protecting themselves on the commission and that they were claiming Morosis as their prospect." After diligent effort appellees located Morosis about 7:45 in the evening, and he promised to meet appellees the next morning. On the evening of the 19th appellees went to appellants' office and told them that the man with Epstein was Morosis and warned appellants of the situation and "to look out for a trap"; that they were liable to walk into on the commission. Morosis did not meet his engagement with appellees on the 20th. Again on the 20th appellees called on appellants about this lease and advised them that, if the lease was made to Santikos and Morosis, a commission would be expected. Though promising to meet appellees, Morosis did not call on them nor give them an opportunity to see him until after the deal was closed. Pending the negotiations between appellants and Epstein, appellees advised them that Epstein was not able to carry the lease.

Appellees brought this suit on allegations of an express contract on an agreed commission compensation, which on the terms pleaded amounted to $18,598.60, and in the alternative on a quantum meruit consideration. In answer to special issues the jury found that appellant J. J. Settegast, Jr., employed appellees to obtain a lessee; that appellant A. J. Binz did not employ appellees to obtain a lessee; that Binz did authorize Settegast to employ brokers to procure a lessee; that Binz did authorize Settegast to agree to pay brokers a commission for procuring a lessee; that Binz and Settegast did not agree to pay plaintiffs a specific commission; that the reasonable value of the services of appellees in procuring the lease was $10,000, with interest thereon from April 3, 1925, at the rate of 6 per cent. per annum. The jury returned an affirmative answer to question No. 8, which was as follows:

"Were the plaintiffs Timmins and Dunnam the procuring cause, as that term is herein defined, of the lease from the defendants to the Main Realty Company?"

Appellants requested the submission of the following issue, answered as indicated:

"If the plaintiffs had Louis Santikos and Nick Marosis as customers or prospects trying to induce them to enter into and accept a lease from the defendants for the Main and McKinney property, did or did not the said Santikos and Marosis quit the plaintiffs and cease to be their customers and decline to deal or negotiate further with or through the plaintiffs before the plaintiffs had succeeded in inducing them to become ready and willing to enter into a lease for said property? Answer 'They

did,' or 'They did not,' as you find the fact to be."

The jury answered: "They did not."

[1] Appellants' principal proposition is that the court erred in refusing to instruct peremptorily in their favor and that the answer to question No. 8 was without support in the evidence. In Parkey v. Lawrence, 284 S. W. 285, the Fort Worth Court of Civil Appeals said it was not necessary to cite authorities in support of the proposition that a real estate broker to recover a commission for negotiating a sale to property rested under the burden of showing he was employed by the owner to negotiate the sale, and that "he rendered services under that employment, which was the efficient and procuring cause of the sale later made by the owner." On this proposition, of course, it follows that the broker can recover his commission only by showing that the services rendered by him were the procuring cause of the sale. In Keener v. Cleveland, 250 S. W. 151, the Commission of Appeals said:

"The rule is well established that, when a real estate broker is instrumental in bringing together the seller and a purchaser who is acceptable to him, and they consummate a sale and purchase of property on terms that are satisfactory to the seller, this constitutes the agent the procuring cause of the sale, and he is entitled to the commission agreed upon."

Construing and applying this proposition from the Keener Case, the court, in the Parkey Case, supra, said:

"It often happens that the broker fails in his efforts to induce the purchaser to make a sale after he has introduced him to the owner, and that a sale is made to the same purchaser by the owner, either alone or through the assistance of some other broker long after the first broker has abandoned further efforts to make the sale. Under such circumstances what is said in the language quoted clearly would not be applicable."

Our Supreme Court said in Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 295:

"The commissions are earned and the broker is entitled to their payment according to the contract if, while it is in force, he procures a purchaser to whom the owner directly makes a sale upon terms which are satisfactory to himself. * * * Having interested a prospective buyer the broker is entitled to a fair opportunity of making a sale to him upon the terms authorized. That the owner, pending the broker's negotiation, may, in disregard or repudiation of his obligation to respect the broker's right to conclude the transaction, take the matter into his own hands, avail himself of the broker's effort, close a sale upon satisfactory terms, and yet deny the broker's right of compensation, is a proposition not to be countenanced. * * * A different state of case is presented and, therefore, a different rule prevails where the broker's effort with a particular buyer has, after fair opportunity and without any fault of the owner, come to naught,

resulting in the failure and termination of his negotiation; and, later, the owner by direct and independent negotiation effects a sale to the same buyer, though upon the same terms originally authorized to the broker. Under such circumstances the broker cannot be justly considered the procuring cause of the owner's sale, and the latter incurs no liability to him on that account. Pryor v. Jolly, 91 Tex. 86, 40 S. W. 959; Hancock v. Stacy, 103 Tex. 219, 125 S. W. 884."

Reviewing Pryor v. Jolly, 91 Tex. 86, 40 S. W. 959, in Hancock v. Stacy, 103 Tex. 219, 125 S. W. 884, our Supreme Court said:

"The agent having failed to furnish a purchaser in accordance with the terms of the contract and his efforts having come to naught without any fault on the part of Pryor, this court held that the fact that Pryor subsequently sold to the same party for the same price, partly on time and part for cash, did not render him liable to the agent. The agency of Jolly terminated when his efforts failed, after he had been afforded reasonable time and had himself abandoned the effort to comply therewith."

In the Parkey Case, supra, Judge Dunklin writing the opinion made the following analysis and review of the authorities of this state denying the broker his commission:

"In the following cases judgments in favor of brokers were reversed and judgments were rendered in favor of the owners by the Courts of Appeals to which the cases were carried; and in each of those cases the evidence shows that the broker was the first one to bring the property to the attention of the buyer or else introduced the buyer to the owner, and thus initiated negotiations between them. But the decisions show that the broker was denied a recovery by reason of the further showing that after he had made an unsuccessful effort to induce the buyer to purchase the property and had ceased his efforts to accomplish that result, all without fault on the part of the owner, the sale was then made to the same purchaser as the result of independent negotiations directly between the owner and the buyer or through the medium of some other broker. Burch v. Hester & Lawhorn (Tex. Civ. App.) 109 S. W. 399; Newton v. Conness (Tex. Civ. App.) 106 S. W. 892; Karr v. Brooks (Tex. Civ. App.) 129 S. W. 160; English v. William George Realty Co., 55 Tex. Civ. App. 137, 117 S. W. 996 (in which a writ of error was denied by the Supreme Court).

"For the same reasons, and under similar circumstances, judgments in favor of brokers were reversed and the causes remanded in the following cases: Duval v. Moody, 24 Tex. Civ. App. 627, 60 S. W. 269; Wilcoxson v. Suddeth (Tex. Civ. App.) 229 S. W. 352.

"And, for the same reasons and under like circumstances, judgments denying a recovery by brokers were affirmed by the Courts of Civil Appeals in the following cases: Witt v. Byrum (Tex. Civ. App.) 135 S. W. 687; Knox & Nunn v. Pierce (Tex. Civ. App.) 146 S. W. 703; Aukerman v. Bremer (Tex. Civ. App.) 209 S. W. 261; Herndon v. Williams (Tex. Civ. App.) 233 S. W. 544, opinion by Justice Buck, specifically based upon the abandonment of the contract by the broker, following the decision in Goodwin v. Gunter, supra."

[2, 3] All the Texas authorities are in accord on the proposition announced by the Supreme Court in Goodwin v. Gunter, supra, that the owner making a sale to his broker's customers "pending the broker's negotiation" must pay the commission as per contract. On the principles announced by the authorities cited, the jury's answer to question No. 8, finding that appellees were the procuring cause of the lease from appellants to Main Realty Company, has support. The lease was made to a corporation. Appellants agreed with appellees that it might be so made. The lease was made by appellants after negotiating direct with Santikos and Morosis, together with Epstein, and after knowing that Santikos and Morosis were the customers of appellees. While made to a corporation, this corporation came into existence only by the aid of Santikos and Morosis. $6,400 of the money of Santikos and Morosis went into the funds of the corporation and this money was paid to appellants. This was an exact compliance with the contract between appellees and appellants. That the lease was made on an option given to Epstein did not defeat appellees' cause of action. The lease was not made to Epstein. That he was instrumental in inducing Santikos and Morosis to join him in the lease with appellants was no defense. Santikos and Morosis were still the customers of appellants, and under the evidence the finding on that issue has full support. They did not quit appellees and did not cease to be their customers, but were their customers at the time the deal was closed for the lease and the time appellants were negotiating direct with Morosis in their office, through which negotiations the lease was made in fact to the corporation owned 50 per cent. by appellees' customers. The following additional authorities are interestingly in point sustaining our conclusion: Trinity Gravel Co. v. Cranke (Tex. Com. App.) 282 S. W. 798; West v. Richards (Tex. Com. App.) 298 S. W. 628; Webb v. Harding (Tex. Com. App.) 211 S. W. 927; Graves v. Bains, 78 Tex. 92, 14 S. W. 256.

[4] In connection with issue No. 8 given supra, the court submitted the following definition of "procuring cause":

"By the term 'procuring cause' as herein used is meant that cause which is a natural and continued sequence, unbroken by any new independent intervening cause, produces the event, without which it would not have occurred."

Appellants' second proposition is urged against that definition:

"The term 'procuring cause' means that cause which in a natural and continued sequence, unbroken by any new independent intervening cause, produces the event, without which it would not have occurred, and in order for brokers to be the procuring cause of a lease they must be the proximate cause of such lease, and

the proximate cause is the efficient producing cause, and the original cause which produces all of the intervening causes and effects which constitute an unbroken chain of events, which lead without any missing link to the ultimate result, which is the closing of the lease."

This proposition suggests no error, since the definition given by the court contains every essential suggested by appellants' proposition.

What we have already said fully disposes of appellants' third proposition, which is only a restatement of the contention that the lease was made to Epstein and that Santikos and Morosis participated in the lease wholly through the efforts of Epstein, and that appellees were in no sense a procuring cause of the lease as made.

[5] The fourth proposition is that there was no evidence to sustain a quantum meruit finding. This is overruled. The evidence abundantly sustains the jury's finding on that issue.

[6] The fifth proposition is that J. J. Settegast, Jr., was entitled to an instructed verdict on the ground that the property leased was the separate property of his wife, and that the contract was wholly for her benefit, and since he disclosed his agency pending negotiations he was not liable. This proposition is overruled. The evidence raised the issue that he was not acting solely for his wife in making the lease. Appellee Timmins testified as to the following conversation on his first visit to Mr. Settegast:

"I returned to Mr. Settegast's office some time in the afternoon, and I told him I had some parties that I thought might be interested in the Main McKinney property, and asked him for a proposition on it, and he said they wanted to lease the property on a long-time lease; that he preferred leasing it rather than selling it, although he might make a sale proposition on it. * * * Mr. Settegast suggested that, if I couldn't make this deal or get this price, he would be willing to trade with the parties; that he would be willing to lease it; that it was costing them almost $1,000 a month to carry; and that any reasonable deal that could be made he was in position to make it."

Though the property was the separate property of Mrs. Settegast, Mr. Settegast was a necessary party lessor, and the proceeds of the lease constituted community property between him and his wife. Arnold v. Leonard (Tex. Sup.) 273 S. W. 800. Therefore he was liable for the commission.

[7] The sixth proposition is that the court erred in rendering a joint judgment against appellants for $10,000. Appellants contend that on the verdict of the jury the judgment should have been for $5,000 against each of them, instead of a joint judgment against both for $10,000. The judgment was not erroneous in the respect assigned. Appellants jointly entered into the contract to lease the property.

They made an express contract of employment. The only matter not expressly agreed to was the value of the services to be rendered by appellees. The appellants agreed jointly to employ and pay appellees. There was no suggestion at the time the contract was made or afterwards that the liability of appellants was to be segregated. The interest of appellant Binz on the one part and of appellant Settegast and his wife on the other was equal. On these facts a joint judgment was correctly entered against appellants. Keithley v. Ward (Tex. Civ. App.) 217 S. W. 428; Gillespie v. Dick (Tex. Civ. App.) 111 S. W. 664.

Appellees specially pleaded for interest at 6 per cent. per annum from April 3, 1925, the date of the execution of the lease contract in issue. The issue of interest was submitted to the jury by the following charge:

"If you answer the foregoing issue giving any amount for the reasonable value of plaintiff's services, determine said amount as of date April 3, 1925, and add after the statement so found the words, 'Together with interest thereon from April 3, 1925, until paid at the rate of 6 per cent. per annum,' and do not include interest in the sum stated."

On the verdict fixing the quantum meruit compensation at $10,000, judgment was entered as a matter of law for appellees for interest on that sum at the rate of 6 per cent. per annum from the 3d day of April, 1925. It thus appears that the trial court decided as a matter of law that appellees were entitled to interest on their demand from the date of the accrual of their cause of action. Against this judgment appellants advance the following proposition:

"Interest is not recoverable as a matter of law on an unliquidated demand. Where brokers recover judgment not on an express contract for a specified amount, but on a quantum meruit, for the value of their services, which value is unknown and unliquidated until fixed by the verdict of the jury, such brokers are not entitled to recover interest, and, if they are entitled to recover interest at all, it is not as a matter of law, but, if recoverable at all, it is discretionary with the jury as to whether or not they shall allow interest, and therefore the court should not have instructed the jury as a matter of law to allow interest."

[8] The question of the right to recover interest as an element of damages has always been recognized by our courts, but the procedure to assess such interest has been the subject of many decisions and still seems to be an open question. On facts on all fours with the facts of this case, we think the Supreme Court, in Ewing v. Foley, 280 S. W. 499, 44 A. L. R. 627, held against appellants' proposition, and on the conclusions of that case we affirm the judgment of the trial court on the issue of interest.

[9] As we understand the Ewing Case, the following essentials have been evolved by our Supreme Court to sustain a judgment for in-

terest on damages: (1) The plaintiff's cause of action must constitute a claim for damages to which may be added interest as an element thereof. (2) The issue of interest as an element of damages must be made by the pleadings. (3) The damages when unliquidated must be fixed by the jury. (4) "The necessary and controverted fact issues" must be submitted to the jury in terms not involving interest; that is to say, it must appear from the charge of the court on the issue of the measure of damages that the jury in finding the specific sum in plaintiff's favor did not include interest as an element thereof. (5) On the verdict thus returned the trial court should and must as a matter of law add interest to the jury's verdict from the date of the accrual of the cause of action to date of judgment. We think this conclusion necessarily follows from what was said by the Supreme Court in the Ewing Case. In support of that holding the court quoted from Watkins v. Junker, 90 Tex. 584, 40 S. W. 11, where it was said:

"If interest be properly an element of damages in any case, then it is so as a matter of law. * * * We think it is an inconsistency to say that a right exists which a jury may or may not enforce as they may deem proper."

This holding, we think, is a denial of the proposition asserted by the Commission of Appeals in St. Louis Southwestern Railway Co. v. Seale & Jones, 267 S. W. 676, that interest as a distinct element of damages must in certain cases go to the jury, which may, on the facts of the case, refuse to assess interest on "equitable" grounds. Under the Ewing Case interest follows "as a matter of law" and is not allowed or refused on equitable grounds, as held in the Jones Case. Therefore to the foregoing five propositions should be added: (6) In all cases where interest may be properly assessed as an element of damages, it is so "as a matter of law," and can be defeated only by the defendant pleading against such demand facts sufficient in law to defeat the plaintiff's claim for interest, such, for instance, as plea of tender against interest eo nomine.

The judgment of the trial court is in all things affirmed.